APAC-ATLANTIC, INC., Petitioner v. CITY OF SALISBURY, CITY OF SALISBURY ZON-
ING BOARD OF ADJUSTMENT, and DAVID PHILLIPS, in his capacity as Zoning
Administrator, Respondents

No. COA10-591

(Filed 5 April 2011)

### Zoning— denial of site plan renovation—impermissible expansion or enlargement of nonconforming use

The superior court did not err by concluding that a city zoning board of adjustment correctly interpreted section 13.3(C) of a land zoning ordinance in denying approval of petitioner's site plan for renovation of its asphalt plant. An increase in the scope, scale, or extent of a nonconforming use, namely the new equipment expanding plaintiff plant's maximum operating capacity, constituted an impermissible expansion or enlargement of the non-conforming use.

Appeal by petitioner from order entered 3 December 2009 by Judge Lindsay R. Davis Jr. in Rowan County Superior Court. Heard in the Court of Appeals 1 December 2010.

*Nexsen Pruet, PLLC, by M. Jay DeVaney, Eric H. Biesecker, and Brian T. Pearce, for petitioner-appellant.*

*Brooks Pierce McLendon Humphrey & Leonard, LLP, by Darrell A. Fruth and V. Randall Tinsley, for respondents-appellees.*

MARTIN, Chief Judge.

Petitioner APAC-Atlantic, Inc. appeals from the superior court's order affirming the decision of respondent City of Salisbury Zoning Board of Adjustment ("the Board") to deny approval of petitioner's site plan for renovation of its asphalt plant. The following evidence was presented at the Board meeting.

Petitioner operates a hot-mix asphalt plant on its property located at 1831 Jake Alexander Boulevard West in Salisbury, North Carolina. In March 2001, petitioner's property was re-zoned from Heavy Industrial (M-2) to General Business (B-6). Petitioner's property is also located within a General Development-A Overlay district (GD-A). The re-zoning made petitioner's use of the property as an asphalt plant a non-conforming use pursuant to section 4.02 of the then-applicable City of Salisbury Zoning Ordinance ("the Zoning Ordinance").

In March 2007, petitioner sought approval to modify its facility and requested a zoning interpretation from David Phillips, the City of Salisbury Zoning Administrator. Petitioner's proposed renovations to its facility include replacement of the bag house, the materials silos, and the conveyer system. Currently, petitioner's plant operates as an "old batch plant" which "mixes up one batch of hot mix at a time." The proposed renovations involve replacing batch equipment with continuous equipment which would "maintain[] a continuous flow of asphalt throughout the operating period." In a letter dated 28 March 2007, the Zoning Administrator provided an interpretation of section 7.01 of the Zoning Ordinance, which governed non-conforming uses of property, and, based on the application of the ordinance to the information before him, allowed petitioner to "proceed with the design of the facility." In August 2007, as was required by sections 16.02 and 16.03 of the Zoning Ordinance, petitioner submitted a site plan describing its proposed modifications for approval by the Zoning Administrator.[1] By letter dated 19 December 2007, the Zoning Administrator interpreted section 7.01 of the Zoning Ordinance and denied petitioner's request for approval of the site plan.

In December 2007, the City of Salisbury enacted the Land Development Ordinance ("the LDO"), which, effective 1 January 2008, replaced the Zoning Ordinance. Section 13 of the LDO regulates non-conforming uses of property. Section 13.1, titled "Purpose and Applicability," provides, in relevant part that,

> [m]any nonconformities may continue, but the provisions of this section are intended and designed to limit substantial investment in nonconformities and to bring about eventual elimination and/or lessen their impact upon surrounding conforming uses in order to preserve the integrity of the area in which it is located.

City of Salisbury, N.C., Land Development Ordinance, § 13.1 (2008).[2] Section 13.3, titled "Nonconforming Uses," provides, in relevant part that,

---

1. The record indicates that section 16.02 of the Zoning Ordinance provided that a permit for excavation, construction, or alteration shall not be valid until the zoning administrator has certified that the plans, specifications or intended use conform to the provisions of the Zoning Ordinance.

2. A non-conforming use is defined as "[a] use which was once a permitted use on a parcel of land or within a structure but which is now not a permitted use of that parcel or structure . . . ." LDO § 18. A permitted use is defined as "[a] use permitted in a given district as a permitted use and so authorized by being listed, or referenced as a permitted use, by district . . . ." LDO § 18.

B.  A nonconforming use shall not be expanded, changed or enlarged, nor shall such a nonconforming use be enlarged by additions to the structure in which the nonconforming use is located (either attached or detached). Any occupation of additional lands beyond the boundaries of the lot on which the nonconforming use is located is prohibited.

C.  A nonconforming use may make necessary alterations to enhance the health, safety, and general welfare of the community by mitigating environmental impacts to air, ground, or water quality; however, these necessary alterations shall not expand or enlarge the nonconforming use.

LDO § 13.3(B)-(C).

By letter dated 20 March 2008, petitioner requested review by the Board of the Zoning Administrator's decision and submitted the required application and fee. However, in April 2008, the Zoning Administrator informed petitioner that it would need to resubmit its site plan in order to be heard at the Board's May 2008 meeting. Petitioner complied with the Zoning Administrator's instruction by letter dated 7 April 2008 and, by letter dated 18 April 2008, the Zoning Administrator again denied approval of the site plan based on the same grounds as those cited in his 19 December 2007 letter. The Board heard petitioner's appeal at its 12 May 2008 meeting, concluded that the LDO governed the appeal, applied the provisions of the LDO, and affirmed the Zoning Administrator's decision.

In July, the Board issued a written decision documenting its 12 May 2008 decision, within which it concluded the following, in relevant part:

7. . . .. [T]he Proposed Modifications would "change" the Applicant's non-conforming use at the facility in violation of Section 13.3(B) of the LDO. The evidence showed that the Proposed Modifications would change the use in at least the following ways:

(a)  the process used to make asphalt would change from a batch process to a continuous process,

(b)  the maximum operating capacity of the plant would change, and

(c)  the capacity to recycle asphalt would change.

8. . . . . [T]he Proposed Modifications do not meet the requirements of Section 13.3(C) of the LDO for each of the following independent reasons:

(a) The Applicant has failed to demonstrate that alterations in the Proposed Modifications are "necessary." In particular, the Applicant has not identified any Federal, State, or local rule, regulation or other requirement mandating the Proposed Modifications;

(b) The Proposed Modifications would impermissibly "expand" or "enlarge" the Applicant's non-conforming use at the facility in that the Proposed Amendments would:

i. expand the maximum operating capacity of the plant;

ii. expand the capacity of the plant to recycle asphalt;

iii. enlarge the commercial viability of the plant by reducing future operating costs.

In August 2008, petitioner filed a petition for writ of certiorari to Rowan County Superior Court, requesting review of the Board's decision pursuant to N.C.G.S. § 160A-388(e2). In November 2009, the superior court conducted a hearing where it heard testimony and arguments from counsel and, on 3 December 2009, entered an order and memorandum of decision affirming the Board's decision. Petitioner appeals from that order.

---

"When a superior court grants certiorari to review the decision of a board of adjustment, the superior court sits as an appellate court, and not as a trier of facts." *Overton v. Camden Cty.*, 155 N.C. App. 391, 393, 574 S.E.2d 157, 159 (2002) (internal quotation marks omitted); *see* N.C. Gen. Stat. § 160A-388(e2) (2009) (providing for appellate review of zoning board of adjustment decisions in the superior court). The superior court's review is limited to determinations of whether (1) the Board committed any errors of law; (2) the Board followed lawful procedure; (3) the petitioner was afforded appropriate due process; (4) the Board's decision was supported by competent evidence in the whole record; and (5) the Board's decision was arbitrary and capricious. *Overton*, 155 N.C. App. at 393, 574 S.E.2d at 159. "If a petitioner contends the Board's decision was based on an error of law, 'de novo' review is proper. However, if the petitioner contends the Board's decision was not supported by the evidence or was arbi-

trary and capricious, then the reviewing court must apply the 'whole record' test." *Four Seasons Mgmt. Servs., Inc. v. Town of Wrightsville Beach,* —— N.C. App. ——, ——, 695 S.E.2d 456, 462 (2010). In applying the whole record test, "[t]he trial court examines the whole record to determine whether the agency's decision is supported by competent, material, and substantial evidence." *Cumulus Broadcasting, LLC v. Hoke Cty. Bd. of Comm'rs,* 180 N.C. App. 424, 426, 638 S.E.2d 12, 15 (2006). "[T]he trial court may not weigh the evidence presented to the agency or substitute its own judgment for that of the agency." *Id.* (internal quotation marks omitted). "[W]hen sitting as an appellate court to review a [decision of a quasi-judicial body], [the trial court] must set forth sufficient information in its order to reveal the scope of review utilized and the application of that review." *Four Seasons,* —— N.C. App. at ——, 695 S.E.2d 462-63 (alterations in original) (internal quotation marks omitted). "An appellate court's review of the trial court's zoning board determination is limited to determining whether the superior court applied the correct standard of review, and to determin[ing] whether the superior court correctly applied that standard." *Overton,* 155 N.C. App. at 393-94, 574 S.E.2d at 160. Finally, we note that "[n]onconforming uses . . . are not favored under the public policy of North Carolina." *Jirtle v. Bd. of Adjustment for Biscoe,* 175 N.C. App. 178, 181, 622 S.E.2d 713, 715 (2005). "In accordance with this policy, zoning ordinances are strictly construed against indefinite continuation of non-conforming uses." *Huntington Props., LLC v. Currituck Cty.,* 153 N.C. App. 218, 223, 569 S.E.2d 695, 700 (2002) (internal quotation marks omitted).

In its petition for writ of certiorari to the superior court, petitioner contended the Board erred by concluding that the new equipment would expand or enlarge the non-conforming use of the property. The superior court's order states that it applied "de novo and 'whole record' review" to the Board's "determinations regarding 'expansion' and 'enlargement' " because those determinations were "based on [the Board's] interpretation of the language of the LDO and [the Board's] factual determinations regarding the effects of the proposed modifications." We agree with the superior court that application of whole record and de novo review to separate components of the Board's decision that the proposed modifications would expand or enlarge the non-conforming use was appropriate. *See generally Land v. Village of Wesley Chapel,* —— N.C. App. ——, ——, 697 S.E.2d 458, 461 (2010) (noting that a court may properly employ both de novo and the whole record test in a specific case so long as the stand-

ards are applied separately to discrete issues); *Malloy v. Zoning Bd. of Adjustment of Asheville*, 155 N.C. App. 628, 630, 573 S.E.2d 760, 762 (2002) (applying whole record and de novo review to the Board's determinations that a new tank was a "structure" as defined in the applicable ordinance). Thus, we proceed to determine whether the superior court correctly applied these standards.

On appeal to this Court, petitioner contends the superior court erred in concluding that the Board correctly interpreted section 13.3(C) of the LDO. We disagree.

Petitioner contends the Board erred by concluding that the proposed modifications would expand or enlarge the non-conforming use pursuant to section 13.3(C) by expanding the maximum operating capacity of the plant. Testimony from the Board meeting indicated that the current permitted production capacity of the plant is 180 tons of asphalt per hour and that the permitted production capacity of the plant with the new equipment would be 300 tons of asphalt per hour. Larry Brickey, President of Thompson-Arthur, a division of APAC-Atlantic, Inc., testified that this increase would allow the plant to run at capacity with shorter hours.

Our Courts have consistently recognized that an increase in the scope, the scale, or the extent of a non-conforming use constitutes an enlargement of a non-conforming use. *See In re O'Neal*, 243 N.C. 714, 723, 92 S.E.2d 189, 195 (1956); *Malloy*, 155 N.C. App. at 632, 573 S.E.2d at 763; *Huntington*, 153 N.C. App. at 227, 569 S.E.2d at 702; *Kirkpatrick v. Village Council for Pinehurst*, 138 N.C. App. 79, 86, 530 S.E.2d 338, 343 (2000). In *Kirkpatrick*, this Court held that the construction of additional campsites within the geographic area of an existing campground, a non-conforming use, impermissibly enlarged the scope of the non-conforming use under the applicable ordinance. *Id.* at 87, 530 S.E.2d at 343. Similarly, in *O'Neal*, our Supreme Court held that an ordinance providing that a non-conforming use shall not be "enlarged or extended" confined the non-conforming use "to its then scale of operation." 243 N.C. at 723, 92 S.E.2d at 195. In *O'Neal*, evidence indicated that a proposed new nursing home would only have the capacity to accommodate twenty-four patients while the petitioner's current facility had previously accommodated up to twenty-seven patients. *Id.* at 717, 92 S.E.2d at 191. Under those circumstances, the Court held that construction of a new facility was not prohibited so long as "the size of the new facility and the scale of its operation . . . conform[ed] substantially to the nonconforming use existent when the . . . ordinance was adopted." *Id.* at 723, 92 S.E.2d at 195.

In the present case, the Board found that the new equipment would expand the plant's operating capacity. On appeal, petitioner does not dispute this finding. Petitioner only contends the Board's conclusion was erroneous because market demand, not operating capacity, controls the amount of asphalt the plant produces and there is no evidence that market demand would increase as a result of the proposed modifications. However, under our prior holdings, renovations resulting in the capacity for an expansion in the scope of the non-conforming use constituted an impermissible enlargement of a non-conforming use, *Kirkpatrick*, 138 N.C. App. at 87, 530 S.E.2d at 343, and the construction of a new building was permissible only where the new building would "*provide facilities* for the operation of a nursing home on substantially the same scale," *O'Neal*, 243 N.C. at 724, 92 S.E.2d at 196 (emphasis added). Here, at least one result of the proposed modifications would be an expanded capacity to produce asphalt. Therefore, in accordance with the rationale articulated in *Kirkpatrick* and *O'Neal*, an enlargement or expansion in the plant's maximum operating capacity constitutes an impermissible enlargement or expansion of the applicant's non-conforming use.

Petitioner also asserts that the whole record lacks competent, material, and substantial evidence to support the Board's finding that the new equipment would enlarge the commercial viability of the plant by reducing future operating costs. Petitioner contends the plant's commercial viability "depends on many unanswered questions." Petitioner claims "the only thing addressed at the hearing was the longevity of the current equipment" and, on this subject, directs our attention to testimony that the current equipment could continue in service "indefinitely" or "for the next fifty years with only very little maintenance." Alternatively, petitioner makes various assertions which essentially suggest that by considering the effect of the proposed modifications on the plant's commercial viability, the Board misinterpreted the ordinance. We disagree.

Under whole record review, "the trial court may not weigh the evidence presented to the agency or substitute its own judgment for that of the agency." *Bellsouth Carolinas PCS, L.P. v. Henderson Cty. Zoning Bd. of Adjustment*, 174 N.C. App. 574, 576, 621 S.E.2d 270, 272 (2005). The trial court's review is limited to determining "whether the Board's findings are supported by substantial evidence contained in the whole record." *Malloy*, 155 N.C. App. at 630, 573 S.E.2d at 762. Upon our review of the whole record in this case, we find substantial evidence to support the Board's finding that the proposed modifica-

tions would "enlarge the commercial viability of the plant by reducing future operating costs."

Malcolm Swanson, Engineering Department Head at Astec, Inc., an asphalt plant manufacturer, testified that "technology has advanced to the point where now . . . as manufacturers of asphalt plants, we build only about 2% batch plants" and that "it really is equipment whose day has passed as far as efficiencies and emissions are concerned." He testified that the new equipment would "reduce[] material costs," including fuel, which, with the current equipment, is lost between batches. He testified that

[i]t's characteristic of a batch plant to operate for short periods of time. Each start/stop cycle has a warm-up involved and [a] certain amount of wasted material involved, so when you eliminate that you eliminate a certain amount of wasted energy. Also, heat loss is an important factor in affecting the amount of fuel that's used by a process. . . . [H]eat loss, of course, corresponds to extra fuel usage . . . . Overall, fuel consumption would be expected to be reduced by about 35% . . . .

He described the new equipment as "state-of-the[-]art" and the current equipment as "1953[,] vintage equipment." Additionally, Mr. Brickey testified that the new equipment would enable the plant to handle orders more efficiently and that "you're going to save fuel, you are going to have better operational costs, and you are going to recoup those costs over time." In sum, the testimony indicates the new equipment would significantly decrease operating costs and enable the plant to operate more efficiently. This testimony was sufficient to support a finding that the new equipment would enlarge the plant's commercial viability. Petitioner's brief merely lists additional factors not discussed at the Board meeting that could potentially affect the plant's commercial viability. In doing so, petitioner asks this Court to re-weigh the evidence presented to the Board. We are not permitted to do so. Furthermore, there is no merit to petitioner's contention that the Board misinterpreted the ordinance by considering the plant's commercial viability. Because "one of the functions of a Board of Adjustment is to interpret local zoning ordinances," we must "give some deference to the Board's interpretation of its own City Code." *CG&T Corp. v. Bd. of Adjustment of Wilmington,* 105 N.C. App. 32, 39, 411 S.E.2d 655, 659 (1992); *see also Four Seasons,* —— N.C. App. at ——, 695 S.E.2d at 463; *Whiteco Outdoor Adver. v. Johnston Cty. Bd. of Adjustment,* 132 N.C. App. 465, 470, 513 S.E.2d 70, 74 (1999). In the present case, the Board did not err by

considering the plant's commercial viability in concluding that the proposed modifications would expand or enlarge the non-conforming use.

Petitioner also contends the Board misinterpreted section 13.3(C) of the LDO by concluding that the proposed modifications would expand or enlarge the applicant's non-conforming use of the property based on a finding that the proposed modifications would "expand the capacity of the plant to recycle asphalt." Petitioner suggests the plant's capacity to recycle asphalt was irrelevant under section 13.3(C) because recycled asphalt is a "raw material used in the production of asphalt" and "the non-conforming use in this case . . . is the production of asphalt, not the use of recycled asphalt." Petitioner cites no legal authority in support of its assertion as is required by Appellate Rule 28(b)(6). *See* N.C.R. App. P. 28(b)(6); *Rabon v. Hopkins,* —— N.C. App. ——, ——, 703 S.E.2d 181, 189 (2010) ("Defendants' argument . . . cites absolutely no legal authority in violation of Appellate Rule 28(b)(6)."). Moreover, we disagree that an expanded capacity to recycle asphalt was irrelevant to the Board's decision. Mr. Swanson testified at the Board meeting that petitioner's current equipment is only capable of using about 15% recycled materials, that the proposed equipment would be capable of using up to 50% recycled materials, and that the capability of the new equipment to use more recycled materials would reduce costs. Under the circumstances of this case, we disagree with petitioner that a reduction in the plant's materials costs was irrelevant to the Board's conclusion that the modifications would expand or enlarge the applicant's non-conforming use.

Petitioner also argues that the superior court erred by concluding that the Board did not improperly impose additional requirements from section 13.1 of the LDO, the "Purpose and Applicability" statement, in its conclusions of law. For this argument, petitioner relies only on *Guilford Financial Services, LLC v. City of Brevard,* 150 N.C. App. 1, 563 S.E.2d 27 (2002) (Tyson, J., concurring in part and dissenting in part), *rev'd for reasons in dissent,* 356 N.C. 655, 656, 576 S.E.2d 325 (2003). Because the duplexes proposed in *Guilford* were expressly permitted by the ordinance and complied with the minimum lot area requirement, the Board erred by denying a permit on the basis of the term "unconcentrated" in a statement of purpose providing that the residential district was "established to protect areas in which the principal use of the land is for medium density single and *unconcentrated* two-family dwellings." *Id.* at 15, 17, 563 S.E.2d at 36-37 (emphasis added). Thus, "a generalized statement of intent of the specifications that follow cannot be used as a basis to

reject a permit that meets all the requirements." *Id.* at 15, 563 S.E.2d at 36 (internal quotation marks omitted).

In contrast, in the present case, the Board concluded that sections 13.3(B) and (C) of the LDO precluded the proposed modifications because the modifications would "change" the non-conforming use in violation of section 13.3(B); were not "necessary" under section 13.3(C); and would "expand" or "enlarge" the non-conforming use in violation of section 13.3(C). In numbered paragraphs following those conclusions, the Board stated that it "considered the[] factors [of section 13.1] when reaching the above Conclusions of Law." Because the Board affirmed the denial of the site plan on the basis that the modifications violated sections 13.3(B) and (C) of the LDO and its order demonstrates that, in reaching those conclusions, it merely considered the stated purposes in section 13.1 of the LDO, the Board did not err. *See Kirkpatrick,* 138 N.C. App. at 85-86, 530 S.E.2d at 342 (noting the Board's interpretation of its ordinance was "in accordance with the stated intent of the ordinance 'not to encourage . . . continued [nonconforming] use, and to prohibit any further nonconformance or expansion thereof' " (alterations in original)).

Finally, petitioner contends section 13.3(C) is an exception to 13.3(B) and permits the proposed modifications. We disagree.

Section 13.3(B) provides that "[a] nonconforming use shall not be expanded, changed or enlarged." LDO § 13.3(B). Section 13.3(C) provides that "[a] nonconforming use may make necessary alterations to enhance the health, safety, and general welfare of the community by mitigating environmental impacts to air, ground, or water quality; *however, these necessary alterations shall not expand or enlarge the nonconforming use.*" LDO § 13.3(C) (emphasis added). Even accepting that petitioner's suggestion that section 13.3(C) permits changes to non-conforming uses as an exception to 13.3(B) has merit, such changes would nevertheless be impermissible under section 13.3(C) if those changes would "expand or enlarge the nonconforming use." Thus, due to our prior conclusion that the Board did not err by concluding that the proposed modifications constitute an expansion or enlargement of the applicant's non-conforming use, the proposed modifications would be impermissible.

Affirmed.

Judges McGEE and ERVIN concur.